UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 19 CR 641 |
| v. | Judge Thomas M. Durkin |
| DONALD LEE and TORANCE BENSON, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Defendants Donald Lee and Torance Benson move for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and for a new trial pursuant to Rule 33. For the reasons stated below, these motions are denied.

### Background

Lee and Benson's trial lasted from September 19, 2022 to November 15, 2022. The jury convicted Lee on Count One (RICO conspiracy) and made additional findings that the racketeering activity upon which Lee's violation was based included the murders of Lamont Ware, Ernest Moore, John Johnson, Charlie Weathers, Malcolm Willie, and Kishaun Mobley. R. 807. The jury also found Lee guilty on the following counts: Count Two (murder of Lamont Ware); Count Three (murder of Ernest Moore); Count Six (unlawful possession of a firearm by a felon); Count Seven (unlawful possession of a firearm by a felon); Count Eight (unlawful possession of a firearm by a felon); and Count Nine (attempted possession of a controlled substance with intent to deliver). *Id*. Lee now moves for a judgment acquittal and for a new trial. R. 912.

1

The jury convicted Benson on Count One and made additional findings that the racketeering activity upon which Benson's violation was based included the murder of Martel Howard and the attempted murders of Dejarvis Johnson, Darius Elmore, and Montel Spurlock. R. 808.[1] The jury also found Benson guilty on the following counts: Count Four (assault of Darius Elmore) and Count Five (unlawful possession of a firearm by a felon). *Id.* Benson also now moves for a judgment of acquittal, R. 925, and for a new trial, R. 926.

## Discussion

### I.  Motions for a Judgment of Acquittal

Defendants may move for a judgment of acquittal on the basis that the evidence presented at trial was "insufficient to sustain a conviction." Fed. R. Crim. P. 29. Defendants face "a nearly insurmountable hurdle" in contending that the jury had insufficient evidence to find them guilty. *See United States v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015). The court must "afford great deference to jury verdicts, view the evidence in the light most favorable to the jury's verdict, and draw all reasonable inferences in the government's favor." *United States v. Brown*, 973 F.3d 667, 682 (7th Cir. 2020). The jury's verdict may be set aside "only if no rational trier of fact could have agreed with the jury." *Id.*

---

[1] Though the jury found that the Government proved that Benson's racketeering activity included the attempted murder of Dejarvis Johnson, the jury found that Government did not prove that Benson "personally discharged a firearm that proximately caused great bodily harm, permanent disability, or a permanent disfigurement to Dejarvis Johnson." R. 808-1.

### A. The Wicked Town Enterprise

Lee and Benson argue that the Government failed to prove the "enterprise" element of a RICO conspiracy. The indictment alleged that Wicked Town was an enterprise dedicated to "[p]reserving and protecting [its] power, reputation, territory and proceeds . . . through threats, intimidation, and violence against rival gang members, suspected government cooperators, drug trafficking competitors, and others who were disloyal or posed threats to the enterprise." R. 284 ¶ 4(a). The indictment further alleges that Wicked Town members including Lee and Benson committed acts of murder in the conduct of the affairs of the enterprise. *Id.* at ¶ 8(n). Lee contends that "no rules actually existed" for the Wicked Town enterprise. R. 912 at 5. Benson contends that Wicked Town lacked "structure" and a "common purpose" and thus was not a "discernible RICO enterprise." R. 925 at 6–7. But contrary to these arguments, there was sufficient evidence presented at trial for the jury to find the existence of the enterprise.

The Government showed through overwhelming evidence that Wicked Town was a discernible enterprise with rules and structure. The evidence showed that from the 1990s through approximately 2020, Wicked Town members organized around a common purpose to distribute drugs in areas controlled by Wicked Town—primarily the 400, 500, and 600 blocks of North Leamington Avenue. *See Boyle v. United States*, 556 U.S. 938, 944 (2009) (citations omitted) ("[A]n enterprise includes any union or group of individuals associated in fact and [] RICO reaches a group of persons associated together for a common purpose of engaging in a course of conduct.");

3

*United States v. Brown*, 973 F.3d 667, 683 (7th Cir. 2020) (evidence that defendants worked together "to control an exclusive territory" and that defendants had common tattoos and signals supported jury's finding that defendants were part of a RICO enterprise); *United States v. Phillips*, 239 F.3d 829, 844 (7th Cir. 2001) (citations omitted) ("The continuity of an informal enterprise with differentiated roles amongst the participants provides the necessary structure to satisfy the statutory requirements of an enterprise.").

The Government presented witnesses who testified to being members of Wicked Town. Marquel Russell, for example, was one of Wicked Town's founding members. Tr. 220–26. He testified that that in the 1990s, he and his friends in the Traveling Vice Lords began referring to themselves as Wicked Town and that Wicked Town operated a drug trafficking business near the 500 block of North Leamington. *Id*. He further testified that following a shooting incident involving a rival street gang in 1996, people started referring to the 500 block of North Leamington as "Wicked Town" and that this solidified Wicked Town as a faction of the Traveling Vice Lords. *Id*. In addition to Russell, co-defendants Nashon Johnson (Tr. 684), Dante Dockett (Tr. 2033), Victor Turner (Tr. 2977), Deshon George (Tr. 3616), and Willie Gardley (Tr. 4639) all testified that they were members of Wicked Town.

The evidence demonstrated that Wicked Town members had common tattoos and spoken phrases. ATF Special Agent Paul Daou identified exhibits showing Wicked Town-related tattoos on Lee (Tr. 171–72), Benson (Tr. 172–174), Russell (Tr. 175), Maurice Earskines (Tr. 176–77), Gardley (Tr. 177–79), George (Tr. 180), Dockett

4

(Tr. 181), Turner (Tr. 182), and Jemar Williams (Tr. 183). And Wicked Town members admitted to using certain phrases when speaking. For example, they would refer to each other as "T" or "Trav" and they took oaths by swearing to "King Neal" or "Rust." *See* Tr. 479 (Williams); Tr. 2269 (Dockett); Tr. 3629 (George).

The evidence also demonstrated that Wicked Town operated within and controlled a specific geographic territory: primarily the 400, 500, and 600 blocks of North Leamington. *See* Tr. 492 (Williams); Tr. 753 (Earskines); Tr. 874 (Mario Nixon); Tr. 1076 (Tamarkin Blumenberg); Tr. 1457 (Montel Spurlock); Tr. 1567 (Deshawn Morgan); Tr. 2032 (Dockett); Tr. 2993 (Turner); Tr. 3710 (George). Wicked Town maintained "trap houses" in and near this area on the 500, 600, and 700 blocks of North Leamington Avenue, where Wicked Town and its members stored their firearms and where they mixed, packaged, and sold drugs. *See* Tr. 1617 (Morgan); 4658–61 (Gardley).

The evidence also demonstrated that Wicked Town members attended Wicked Town gatherings and ceremonies. For example, Wicked Town members would gather at events called "repasts" which honored birthdays or funerals of deceased members. Tr. 1676 (Morgan); Tr. 4607 (Dockett). Wicked Town members would also gather for initiation ceremonies where new members were "blessed in." *See* Tr. 472 (Williams); 2033 (Dockett); 2980 (Turner); 3620 (George); 4642 (Gardley). As part of the initiation ceremony, the new members would recite a "Statement of Love" (Gov. Ex. 100) and an "Oath" (Gov. Ex. 101).

5

The evidence also demonstrated that Wicked Town operated under certain rules. Lee argues that the rules did not "actually exist." R. 912 at 5. But multiple witnesses testified that Wicked Town had three primary rules: (1) do not sell or lose Wicked Town guns; (2) never talk to law enforcement; and (3) use violence to protect Wicked Town and retaliate against rival gangs. *See* Tr. 479–81 (Williams); Tr. 688–90 (Johnson); Tr. 1635–37 (Morgan); Tr. 2036–39 (Dockett); Tr. 2987–92 (Turner); Tr. 4745 (Gardley). Indeed, Lee was the leader or "chief" of Wicked Town. *See* Tr. 687–88 (Johnson); Tr. 1573–74 (Morgan); Tr. 2071 (Dockett); Tr. 3619 (George); Tr. 4764 (Gardley). Lee replaced Russell as the chief in 2004 or 2005 after Lee killed the head of a rival gang. Tr. 688 (Johnson). And as the chief, Lee supplied the guns and he made and enforced the rules. Tr. 3029 (Turner); Tr. 3634 (George); Tr. 4744 (Gardley).

The evidence also demonstrated—in contrast to Benson's argument that Wicked Town lacked "structure" (R. 925 at 7)—that Wicked Town members had defined roles and responsibilities. Turner testified as to Wicked Town's structure. He explained that Wicked Town members were either "drug sellers" or "shooters." Tr. 2990. Drug sellers started off as "workers" and after a few years were promoted to "runners." Tr. 2991. Workers sold drugs on the street. *Id.* Runners divided up the narcotics and distributed "packs" (13 individual baggies of narcotics) to the workers. Tr. 3006–10. Once all the drugs in a "bundle" (made up of seven "packs") were sold, the worker and the runner would each take a cut with the remainder (over half of the money) would go to Lee. *Id.* The "shooters" were tasked with protecting Wicked Town territory from rival gangs and retaliating against any threats. Tr. 3053.

Finally, the evidence demonstrated—in contrast to Benson's argument that Wicked Town lacked a "common purpose" (R. 925 at 7)—that Wicked Town was organized around a common purpose to control drug trafficking in the Wicked Town territory and that Wicked Town members committed criminal acts in service of that purpose.[2] Between 2000 and 2020, workers and runners in Wicked Town's drug trafficking operation distributed drugs in Wicked Town territory. Tr. 692 (Johnson); Tr. 2992 (Turner); Tr. 4652 (Gardley). To protect their ability to distribute drugs, Wicked Town members murdered people who spoke with law enforcement. *See* Tr. 1906–07 (Daou testifying as to an audio recording where Lee states that Donald Holmes was murdered for "snitching"). Wicked Town members also murdered rival gang members who infringed on their territory. Tr. 1585 (Turner: "[You would] die if you tried to sell drugs. If you [were not a Wicked Town member] in the Wicked Town territory, you'll die and people knew that."). Overall, the evidence presented at trial demonstrated that Wicked Town's violence amounted to approximately 19 murders and 11 attempt murders in approximately a 20-year period. Tr. 5729–31 (Daou).

For these reasons, the Government has sufficiently proved the "enterprise" element of a RICO conspiracy as to both Lee and Benson.

---

[2] Benson also identifies certain Wicked Town members who committed murders or sold drugs independent of Wicked Town and contends that this undermines the enterprise element. R. 925 at 7. But the fact that certain members committed crimes separate from their roles in Wicked Town does not change the evidence discussed in this opinion, that Wicked Town members committed murders and sold drugs to support Wicked Town's common purpose.

## B. Acts Committed by Lee

### 1. Murder of Lamont Ware

The jury convicted Lee of the first-degree murder of Lamont Ware (Count Two) and found that Lee committed the murder as part of the RICO conspiracy (Count One – Additional Findings). R. 807. A person commits first degree murder when he "kills an individual *without lawful justification*." 720 ILCS 5/9–1(a) (emphasis added). When the accused believes that he is acting in self-defense, even if that belief is unreasonable, "that will lessen the offense from first degree to second degree murder." *United States ex rel. Ojeda v. Harrington*, 2014 WL 2581320, at *8 (N.D. Ill. June 9, 2014) (citing 720 ILCS 5/9–2(a)(2)). Lee argues that he "truly but unreasonably believed that the use of deadly force was justified" to protect himself or others, and thus that the Government failed to prove first-degree murder. R. 912 at 24.

The following evidence is sufficient to support a finding that Lee did not truly believe he had been acting in self-defense and is thus sufficient to support the jury's verdict. Testimony from Robert Adams (a member of the rival gang) and from Jemar Williams (a member of Wicked Town) established the following: on July 22, 2000, Lee and other Wicked Town members were involved in a street fight with members of a rival gang; Lee was the only person at the fight with a gun; Lee fired off a first shot which stopped the fight; after that first shot, the rival gang members scattered and ran away from Lee; and Lee shot Ware in the back while Ware was running away. Tr. 369–92 (Adams); Tr. 494–520 (Williams). The ballistic evidence was consistent with Adams and Williams' testimony that Lee was the only person with a gun and showed that all six .22-caliber fired cartridge cases recovered from the scene had been

chambered in the same gun. Tr. 654–56 (Forensic Scientist Marc Pomerance). Consistent with Adams and Williams' testimony that Lee shot Ware in the back as Ware was running away, Ware's medical examiner testified that Ware died from a gunshot wound to the back. Tr. 572 (Dr. Ponni Arunkumar). A rational trier of fact could have found that Lee murdered Ware.

### 2. Murder of Ernest Moore

The jury convicted Lee of the first-degree murder of Ernest Moore (Count Three) and found that Lee committed the murder as part of the RICO conspiracy (Count One – Additional Findings). R. 807. Lee disputes that the Government met its burden to show that he committed first-degree murder and argues that "the shooter was Maurice Earskines," not Lee. R. 912 at 28.

The following evidence is sufficient to support a finding that Lee, not Earskines, shot and killed Moore, and is thus sufficient to support the jury's verdict. Testimony from Wicked Town members Nashon Johnson and Maurice Earskines established that on December 23, 2022, Lee determined that Wicked Town needed to retaliate and kill rival gang member Tamarkin Blumenberg. To find Blumenberg, Lee, Johnson, Earskines, and Jasper Adams drove around in a Wicked Town SUV with Lee carrying a .38 caliber weapon and Earskines carrying a .357 caliber weapon. While driving, they identified Blumenberg as riding in a Mercury Marquis. Tr. 698–707 (Johnson); Tr. 784–93 (Earskines). Rival gang member Henry Stevenson testified that Ernest Moore was driving the Marquis, Blumenberg was in the front passenger seat, and Stevenson was in the back. Tr. 948 (Stevenson).

Testimony further established that the Wicked Town SUV pulled up next to the Marquis, that Lee fired multiple shots into the Marquis, and that Lee was the first and only person to fire the initial round of shots. Tr. 707–09 (Johnson); Tr. 793–98 (Earskines). After the shots fired by Lee, Earskines observed that driver of the Marquis (Moore) had been shot. Tr. 797. Also, after the shots fired by Lee, Stevenson saw that Moore was slumped over. Tr. 950. At this point, Earskines stepped out of the Wicked Town SUV and fired additional shots into the Marquis. Earskines then got back into the SUV and the Wicked Town members drove away. Tr. 796 (Earskines). Ballistic evidence recovered by the Chicago Police Department confirmed that Moore had been hit by a .38 caliber bullet. Tr. 1939–41 (stipulation). A rational trier of fact could have found that Lee murdered Moore.

### 3. Murder of John Johnson

The jury found that Lee committed the first-degree murder of John Johnson as part of the RICO conspiracy (Count One – Additional Findings). R. 807. This finding was largely based on testimony from rival gang member Mario Nixon. According to Nixon, Johnson approached Lee hoping to settle a dispute between Wicked Town and Nixon's gang. As Johnson approached, he was not holding a gun but had one tucked in his waistband. Johnson was outnumbered: Lee was in a group of approximately five Wicked Town members whereas Johnson was alone having left Nixon sitting in the car. Nixon observed Johnson try to speak with Lee and further that, during the conversation, Lee pulled out his gun and shot at Johnson. Lee fired first, and Johnson pulled out his gun to return fire while retreating to the car. Tr. 892–905.

10

Lee attempts to discredit Nixon's testimony by identifying a prior inconsistent statement made by Nixon, where Nixon stated that Johnson fired his gun first. R. 912 at 6–9. Lee also identifies testimony from Michael Colbert, a third-party witness who testified that a bald man fitting Johnson's description fired first. *Id*. But the jury considered testimony from both Nixon and Colbert, and the jury heard evidence regarding Nixon's prior statement. Tr. 907–08 (Nixon explaining his prior statement); Tr. 5796 (Colbert). Where witnesses give conflicting testimony, it is the jury's province to determine credibility. The jury could have rationally found Nixon's testimony at trial to be credible and the Court cannot disturb that determination. *See United States v. Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999) (citations omitted) (In reviewing a Rule 29 motion, courts must "defer to the credibility determination of the jury."). Because Lee's argument goes to credibility, not sufficiency, this argument is without merit. A rational trier of fact could have found that Lee murdered Johnson as part of the RICO conspiracy.

### 4. Murder of Charlie Weathers

The jury found that the racketeering activity upon which Lee's violation is based includes the first-degree murder of Charlie Weathers. R. 807 (Count One – Additional Findings). R. 807. This finding was based largely on testimony that the jury heard from Willie Gardley. According to Gardley, Lee provided Gardley with a firearm from one of Wicked Town's trap houses at 505 North Leamington, knowing that Gardley would shoot and kill Weathers, who Lee and Gardley believed to be a member of a rival gang. Tr. 4686–88.

11

Lee attempts to discredit Gardley's testimony by arguing that Gardley had a motive to lie to receive a reduced sentence. R. 912 at 10–12. Lee also argues that Gardley's trial testimony was inconsistent with his grand jury testimony where Gardley stated that Lee had provided the firearm from 505 North Leamington rather 501. *Id.* at 11. Lee also points to testimony from Renard Williams, a witness who testified that Gardley already possessed a gun on the day that Gardley murdered Weathers, and thus Gardley would not have needed to obtain a gun from Lee. *Id.* at 12. But the jury considered testimony from both Gardley and Williams, and the jury heard evidence regarding Gardley's prior statement to the grand jury. Tr. 4965 (examination of Gardley regarding the prior statement); Tr. 4197 (Williams). As stated above, it is the jury's province to determine credibility. The jury could have rationally found Gardley's testimony at trial to be credible and the Court cannot disturb that determination. Because Lee's argument goes to credibility, not sufficiency, this argument is without merit. A rational trier of fact could have found that Lee's racketeering activity included the murder of Charlie Weathers.

### 5. Murder of Malcolm Willie

The jury found that the racketeering activity upon which Lee's violation is based includes the first-degree murder of Malcolm Willie. R. 807 (Count One – Additional Findings). This finding was based largely on testimony that the jury heard from Victor Turner. According to Turner, Lee instructed Turner to retaliate against a rival gang by murdering Willie. Tr. 3060–61. Lee attempts to discredit Turner by arguing that Turner had a motive to lie to receive a reduced sentence. R. 912 at 13–

12

15. Again, it is the jury's province to determine credibility and the jury found Turner's testimony at trial to be credible. Because Lee's argument goes to credibility, not sufficiency, this argument is without merit. A rational trier of fact could have found that Lee's racketeering activity included the murder of Malcolm Willie.

### 6.  Murder of Kishaun Mobley

The jury found that the racketeering activity upon which Lee's violation is based includes the first-degree murder of Kishaun Mobley. R. 807. (Count One – Additional Findings). Lee argues that the Government failed to provide sufficient evidence to support this finding. R. 912 at 15–19.

The following evidence is sufficient to support this finding. First, testimony from Willie Gardley established that around December 2023, Wicked Town was in a feud with the rival "LF" faction of the Four Corner Hustlers gang. Specifically, on December 23, 2017, Darius Murphy and Desmond Brown spoke with Lee and requested a gun to go after Mobley, a member of the LF faction. That same day, Gardley spoke with Lee and Lee directed Gardley to supply Murphy and Brown with a gun owned by Lee. Gardley then supplied Brown and Murphy with Lee's gun. Finally, Gardley spoke to Murphy on the phone later that day and Murphy confirmed that he and Brown shot and killed Mobley. Tr. 4768–804 (Gardley). On January 11, 2018, Brown and Murphy shot and killed LF member Uriah Hughes. *Id.* Second, ballistics evidence presented at trial shows that the same gun used to kill Mobley on December 23 was also used to kill Hughes on January 11. Tr. 5261–63. Third, testimony from multiple Wicked Town members established that Lee, as chief of

13

Wicked Town, supplied Wicked Town members with firearms. Tr. 1667–68 (Morgan); Tr. 2072 (Dockett); Tr. 3031 (Turner); Tr. 4651 (Gardley). A rational trier of fact could have found that Lee's racketeering activity included the murder of Kishaun Mobley.

### 7. Attempted Possession of a Controlled Substance

The jury found Lee guilty of attempted possession of a controlled substance (cocaine base, also known as crack cocaine) with intent to deliver (Count Nine). R. 809. Lee admits that during recorded calls with Tyree Allen, Lee "agreed to exchange a firearm for two ounces of cocaine." R. 912 at 29. Lee argues, however, that "while the government may have proved that Lee intended to possess 28 grams or more of some kind of cocaine, there was insufficient evidence to support the jury's finding that the offense involved cocaine base as opposed to powder cocaine." *Id.*

The following evidence was sufficient to support the jury's finding. According to Agent Daou, Lee was a "frequent . . . crack cocaine customer" of Allen's and the amount of cocaine purchased by Lee was consistent with the wholesale purchase of crack cocaine rather than an individual user's purchase of powder. Tr. 1383–88 (Daou). Additionally, Lee admitted during a post-arrest interview that he intended to break up the two ounces of cocaine and sell it "whole", which meant (as Agent Daou understood it) that Lee had intended to sell crack cocaine rocks rather than powder. Tr. 1436–50 (Daou). A rational trier of fact could have found Lee guilty of attempted possession of a controlled substance with intent to deliver.

### C. Acts Committed by Benson

Benson argues that, to the extent the Government charged Benson with committing crimes, these were "random criminal acts" that did not "constitute a pattern of racketeering" and "they [were] not acts which were connected to the Wicked Town enterprise." R. 925 at 12. Benson's argument ignores the evidence tying Benson to Wicked Town. Multiple Wicked Town members testified that Benson, known by the nicknames "Blackie" or "Black," was a member of the Wicked Town street gang and served the role of a "shooter." Tr. 1599 (Morgan); Tr. 2081 (Dockett); Tr. 2994 (Turner); Tr. 4235 (Dockett); Tr. 4654 (Gardley). Benson's argument also ignores the evidence (discussed below) that Benson murdered Martel Howard and carried out attempted murders of Darius Elmore, Dejarvis Johnson, and Montel Spurlock all as part of a pattern of racketeering activity connected to the Wicked Town enterprise.[3]

Regarding drug sales, the Government presented sufficient evidence that Benson's drug sales on the 500 and 600 blocks of North Leamington were part of a pattern of racketeering activity connected to the Wicked Town enterprise. Turner (Tr. 2994) and Gardley (Tr. 4654) testified that Benson sold drugs on the 500 and 600 blocks of North Leamington when Wicked Town controlled those blocks. And Turner (Tr. 1585) confirmed that no one could sell heroin on Leamington unless they were part of Wicked Town or had Lee's approval.

---

[3] As noted above, the jury found that the Government proved that Benson's racketeering activity included the attempted murder of Dejarvis Johnson, but not that Benson personally discharged a firearm that proximately caused great bodily harm to Johnson.

### 1. Murder of Martel Howard and the Assault and Attempted Murder of Darius Elmore

The jury found that the racketeering activity upon which Benson's violation is based included the murder of Martel Howard (Count One – Additional Findings) and the attempted murder of Darius Elmore (Count One – Additional Findings). The jury also convicted Benson of assaulting Darius Elmore with a dangerous weapon in aid of racketeering. (Count Four). Benson argues the Government failed to prove these acts. R. 925 at 15–20.

The following evidence was sufficient to support the jury's findings. On January 21, 2016, Benson and Howard got into an argument near Huron and Kilpatrick. According to testimony from Renard Williams, who observed the argument, Benson and Howard were arguing over a Wicked Town gun—Benson was in possession of the gun, but Howard wanted it. Tr. 4271–76. Darius Elmore (friend of Howard's), Dashon Williams (Wicked Town member), and Ciara Hicks (girlfriend of Howard's) were also present near Huron and Kilpatrick, and they observed aggressive gestures and body language between Benson and Howard, indicative of an argument. Tr. 4098 (Elmore); Tr. 4388 (D. Williams); Tr. 5101 (Hicks). The fight ended when Benson got into an SUV and drove northbound on Kilpatrick. Tr. 4099 (Elmore); Tr. 4281 (R. Williams); Tr. 4389 (D. Williams). About three to ten minutes after Benson drove off, shots rang out. Tr. 4100 (Elmore); Tr. 4391 (D. Williams). Both Howard and Elmore were shot. Howard died and Elmore was shot in the legs. Tr. 4107 (Elmore). Elmore, Renard Williams, and Dashon Williams all testified that the shooter was standing in the same place—the first alley north of Huron, at the north

end of an open field. Tr. 4102 (Elmore); Tr. 4284–85 (R. Williams), Tr. 4391–92 (D. Williams). Elmore saw that the shooter was wearing the same outfit that Elmore had seen Benson wearing minutes before. Tr. 4103. The shooter's hood was tied around his face, so Elmore could not see his face, but Elmore testified at trial that he believed with certainty the shooter was Benson. Tr. 4112. In a photo lineup on November 18, 2020, Hicks identified Benson as the shooter. Tr. 5115–30. The morning after the shooting, Benson exchanged Facebook messages with one of Dashon William's friends. Benson wrote: "I ain't mean fa that shit to happen wat I was doing was for all us, bro." Tr. 4400 (D. Williams). Dashon Williams understood that Benson was referring to Howard's murder. *Id.*

Benson challenges the credibility of Hicks and Elmore in identifying Benson as the shooter. R. 925 at 18–20. But as discussed above, it is the jury's province to determine credibility and the jury could have rationally found Hicks and Elmore's testimony to be credible. Because this argument goes to credibility, not sufficiency, this argument is without merit.

Benson also argues that the acts at issue on January 21 concerned personal animus between Benson and Howard unrelated to the Wicked Town enterprise. R. 926 at 15–16. An act becomes "racketeering activity" when the act was committed "for the purpose of maintaining or increasing position in [a RICO] enterprise." *United States v. Garcia*, 754 F.3d 460, 472 (7th Cir. 2014) (citations omitted). Benson and Howard were both Wicked Town members and they were arguing about who had rightful possession of a Wicked Town firearm. The jury could have rationally inferred

17

that the possession of Wicked Town firearms conferred status with the gang and that Benson retaliated against Howard because he believed that Howard had threatened his status. In other words, the jury could have rationally inferred that Benson retaliated against Howard for the purpose of maintaining his position and reputation in Wicked Town. A rational trier of fact could have found that Benson killed Howard, shot Elmore, and that Benson carried out these acts in furtherance of the RICO conspiracy. A rational trier of fact could have found that Benson's racketeering activity included the murder of Martel Howard and the attempted murder of Darius Elmore.

### 2. Attempted Murders of Dejarvis Johnson and Montel Spurlock

The jury found that racketeering activity upon which Benson's violation is based included the attempted murder of Dejarvis Johnson (Count One – Additional Findings) and the attempted murder of Montel Spurlock (Count One – Additional Findings). The evidence showed that Benson carried out these acts in connection with his role in Wicked Town. Benson shot Johnson during a robbery carried out by Benson and fellow Wicked Town member Demond Brown. Tr. 3490–525 (D. Johnson); *see also* Tr. 3976–93 (testimony of Sheila Walters explaining that Benson was part of Wicked Town robbery crew). Regarding Spurlock, Wicked Town members believed that Spurlock was a member of the rival LF faction, and Benson shot Spurlock during an ongoing feud between Wicked Town and the LF faction. Tr. 4874–84 (Gardley).

Benson challenges the credibility of Dejarvis Johnson in identifying Benson as the shooter in the Johnson attempted murder. R. 925 at 20–23. Benson also

18

challenges the credibility of Willie Gardley in identifying Benson as the shooter in the Spurlock attempted murder. *Id.* at 23–25. Because these arguments go to credibility, not sufficiency, these arguments are without merit. A rational trier of fact could have found that Benson's racketeering activity included the attempted murders of both Dejarvis Johnson and Montel Spurlock.

## II.    Motions for New Trial

Defendants argue that even if the Court denies their motions for judgment of acquittal, they are entitled to a new trial. R. 912 at 30 (Lee); R. 926 (Benson). A district court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). A new trial is in the interest of justice "only if there is a reasonable possibility that the trial error had a prejudicial effect on the jury's verdict." *United States v. Flournoy*, 842 F.3d 524, 530 (7th Cir. 2016). Granting a new trial is "reserved for only the most extreme cases," and courts approach such motions "with great caution." *United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021); *see also United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) ("A jury verdict in a criminal case is not to be overturned lightly.").

Lee and Benson both argue that the Court erred when ruling on pre-trial motions and objections during trial and they contend that the "cumulative effect" of these errors requires a new trial "in the interests of the justice." R. 912 at 30; R. 926 at 7. Lee, however, fails to identify a single specific error. He makes a cursory argument that the Court erred in "denying [his] pretrial motions, . . . granting the [G]overnment's contested motions *in limine*, . . . [and] denying [his] oral motions and

19

objections." Such "undeveloped arguments are waived." *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017). Lee also "adopts any and all arguments" made by Benson. R. 912 at 30. Though Benson identifies specific purported errors, his arguments are also cursory and undeveloped. Even if not waived, these arguments have no merit, as addressed below.

Regarding pre-trial rulings, Benson identifies (R. 926 at 4–5) the following purported errors without adding any new arguments not already addressed in the pre-trial briefs: First, that the Court erred in denying his motion for a bill of particulars. But for the reasons stated in the Court's order at R. 568, the Court finds that the denial was proper. Second, that the Court erred by allowing expert testimony regarding firearm toolmark analysis. But for the reasons stated in the Court's memorandum opinion and order at R. 620, the Court finds that this testimony was properly allowed before the jury. Third, that the Court erred by allowing the Government's gang expert to testify. But the Court held a *Daubert* hearing on this issue (R. 676) and for the reasons stated on the record (R. 996 at 633–39), the Court finds that this testimony was properly allowed before the jury. Fourth, that the Court erred in denying Benson's motion to dismiss Count One of the indictment on the grounds that the indictment failed to properly allege a RICO enterprise. But for the reasons stated in the Court's memorandum opinion and order at R. 578, the Court finds that Benson's motion to dismiss was properly denied. Additionally, as discussed above, the Government provided overwhelming evidence that Wicked Town was a RICO enterprise.

Regarding trial rulings, Benson argues generally that the Court erred by allowing evidence of other crimes that had not been identified in the indictment as part of the pattern of racketeering activity. R. 926 at 5–6. Benson identifies just one example: evidence relating to the murder of Deante Dale. *Id*. But it is "clear the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy." *United States v. LaSpina*, 299 F.3d 165, 182 (2d Cir. 2002). The Court finds that Dale's murder was within the scope of the conspiracy. As discussed above, Benson shot and killed Martel Howard to retaliate against Howard for threatening Benson's status and reputation with Wicked Town. Howard, however, was another Wicked Town member. For this reason, Benson attempted to cover up Howard's murder by lying to other Wicked Town members and claiming that a rival gang, MOF, had killed Howard. *See* Tr. 4837 (Gardley). Dale was a member of MOF and Benson shot and killed Dale under the pretext of Wicked Town retaliation. Tr. 4858 (Gardley). Benson also identifies a single statement made in rebuttal where the Government characterized a piece of evidence as substantive when the evidence had been entered for a limited purpose. R. 926 at 7. But Benson immediately objected to the statement and the jury received a limiting instruction immediately afterward. Tr. 6428–6432. The Court finds that this issue was properly addressed by the limiting instruction.

Finally, Benson argues that evidence "preponderate[s] so heavily against the verdicts that it would be manifest injustice to permit them to stand." R. 926 at 8. But this is not one of the extreme cases that warrants a new trial. After viewing the trial,

carefully observing the testimony and demeanor of the witnesses, and thoroughly reviewing the extensive record, the Court does not have "strong doubt", indeed the Court does not have any doubt, as to Defendants' guilt on the charged offenses. *See United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999). As described above, the evidence was sufficient to support the jury's verdict. Given the incriminating testimony and exhibits presented at trial and considered by the jury, it is not a manifest injustice to let the verdict stand.

## Conclusion

For the foregoing reasons, Lee's motion for a judgment of acquittal and for a new trial (R. 912), Benson's motion for a judgment of acquittal (R. 925), and Benson's motion for a new trial (R. 926) are denied.

ENTERED:

_Thomas M Durkin_
_____
Honorable Thomas M. Durkin
United States District Judge

Dated: June 5, 2024