**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 19 CR 641 |
| v. | |
| DONALD LEE and TORANCE BENSON | Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

The facts relevant to this motion are eerily reminiscent of those in another criminal case before this Court in which the government recently conceded the need for a new trial. *See United States v. Spann*, No. 17 CR 611, 2025 WL 1017668, at *1 (N.D. Ill. Apr. 4, 2025). For the following reasons, the Court finds that the same result is required in this case, so Defendants' motion for a new trial is granted and their motion to dismiss the indictment is denied.

## Background

### I.     Statements in Emails

On November 15, 2022, after an eight week trial, a jury convicted Defendants Donald Lee and Torance Benson of a RICO conspiracy charge and murders in aid of that conspiracy. The convictions were based in large part on the testimony of eight cooperating witnesses. Prior to the sentencing of one of the cooperating witness, Deshawn Morgan, Morgan's counsel argued that a 30-year sentence was appropriate because the lead prosecutor on the case, John Mitchell, "expressed the appropriateness of a 30 year sentence" in an email sent five months before trial and

two months before Morgan's change of plea hearing. *See* R. 1095 at 28 (Ex. 10).

Mitchell's email of May 22, 2022, stated the following:

> [My colleague and] I are in agreement that if the sentencing were tomorrow, we would recommend a sentence of 30 years for Deshawn Morgan. Not 31, or 32, but 30. And of course you could recommend a sentence of 25 years. While not exactly what you're looking for, I hope that my commitment in writing that our recommendation is 30 years addresses some of your concerns. I'll also add that our anticipated recommendation of 30 years is not written in stone—if Mr. Morgan has information about additional crimes and we can corroborate the information and use it to bring charges against one or more people, we will keep an open mind about whether a recommendation of less than 30 years is more appropriate. One last caveat: if Mr. Morgan has a problem between now and sentencing—for example, another serious incident in the jail, or tampering with a witness, etc.—we reserve the right to reconsider and recommend a sentence in excess of 30 years. But I don't anticipate that happening, and if there aren't any problems, I can safely say that our recommendation won't exceed 30 years.

R. 1095-10 at 2. Morgan later signed written plea and cooperation agreements that called for a sentencing range of 25-35 years, governed by Federal Rule of Criminal Procedure 11(c)(1)(C).

Because Mitchell's email promised a specific sentencing recommendation that was not provided for in the written plea and cooperation agreements, the Court became concerned that Mitchell's email should have been disclosed to counsel for Defendants prior to trial. The Court promptly held a hearing at which the government confirmed that the email had not been disclosed prior to trial. The Court ordered the email disclosed to Defendants' counsel immediately. *See* R. 1100. The Court also ordered the government to search for other similar emails and disclose

2

them to Defendants' counsel. *See* R. 1115. Several days later, the government disclosed four additional emails regarding four other cooperating witnesses. *See* R. 1111. Those emails included statements by Mitchell regarding either his intended sentencing recommendation or his intention to advocate that the Cook County States' Attorney's Office drop state charges for certain cooperators. *See id.*

Regarding cooperating witness **Nashon Johnson**, whose plea and cooperation agreements eventually called for a sentencing range of 10-20 years, Mitchell stated on April 14, 2022:

> I'm not allowed to commit to any particular sentence within that range (we'll make that decision closer to sentencing), but the plea agreement will call for a sentence of no less than 10 years and no more than 20 years. . . . And while I can't commit to a sentence until closer to sentencing, I fully anticipate recommending a 10-year sentence.

*Id.* at 1

Regarding cooperating witness **Marquell Russell**, whose plea agreement and cooperation agreements eventually called for a range of 10-20 years, Mitchell stated on April 14, 2022:

> [The U.S. Attorney has] approved . . . a sentencing range of 10 to 20 years [and] no one has a lower range than the 10-20 year range we are offering Marquel. . . . [W]e're agreeing to a 10-15 year sentence with no credits for prior sentences.

*Id.* at 2. He then added on April 15, 2022:

> I think it's [sic] a 10-15 year range is reasonable because a 10-year sentence would be about 60% below the low end of the guidelines range.

*Id.* at 2.

3

Regarding cooperating witness **Victor Turner**, Mitchell stated on April 14, 2022, that the proposed plea agreement would resolve:

> all of [Turner's] outstanding cases—specifically, I'm going to work with the [Cook County State's Attorney] and recommend that they dismiss the state murder case right after the change of plea hearing.

*Id.* at 2. Presumably Mitchell was referring to the then-pending state case charging Turner with the murder of Sammie Hodges, which was also a predicate act in the RICO conspiracy Defendants were charged with in this case. Turner's plea agreement in this case included his admission to murdering Hodges. The state murder case against Turner was dismissed on June 22, 2022. Turner pled guilty in this case on July 5, 2022.

Regarding cooperating witness **Willie Gardley**, Mitchell stated on April 14, 2022 that the proposed plea agreement would resolve:

> all of [Gardley's] outstanding cases—specifically, Willie has a pending attempted murder case in Cook County, and that case will be dropped before the change of plea hearing.

*Id.* at 3. Presumably Mitchell was referring to the then-pending state case charging Gardley with felony attempted murder and aggravated battery. These charges were not predicate acts in this case, and the state case was still pending as of the time of Gardley's plea and the trial in this case.

After the government disclosed these four emails, the government provided additional discovery to Defendants. In that discovery, Defendants found emails between Mitchell and various Cook County Assistant State's Attorneys and Gardley's counsel, sent after the trial in this case, concerning Gardley's state charges. On May

9, 2023, the State's Attorney's Office sent an email to Mitchell informing him that Gardley would plead guilty to felony aggravated battery. Mitchell forwarded that email to Gardley's counsel and stated:

> I feel terrible that he had to plead to this – the prior ASAs told me that they wouldn't have any problem dismissing the case. When you get a minute, please give me a call.

R. 1148-16 at 1. Six days later, Mitchell sent an email to an Assistant State's Attorney and stated:

> Could I have another conversation with you and your colleagues about Willie Gardley's case? Based on my discussions with the prior ASA on Gardley's case and the way that the USAO and CCSA handled the cases involving Gardley's cooperating co-defendants' cases, I'm concerned that we (the USAO and CCSA) are treating Gardley different than similarly situated co-defendants. Specifically, the CCSA dismissed or is dismissing pending state cases against cooperating co-defendants Victor Turner (dismissed a state murder case), David Arrington (another state murder case), and Deshawn Morgan (state gun and drug cases), and the judge in the federal case is going to consider all of that conduct at sentencing in the federal case. If at all possible, I'd be grateful to work with you to make sure that Gardley gets the same treatment as the other cooperating co-defendants in this case.

R. 1148-15 at 1. Mitchell also forwarded this email to Gardley's attorney. *See id.* Four months later, the State's Attorney's Office dropped one of Gardley's attempted murder counts, amended the other attempted murder count to a misdemeanor aggravated assault charge, and amended the two felony aggravated battery counts to misdemeanor battery charges. *See* R. 1148-17.

## II.    Statements at Plea Hearings

All five cooperating witnesses pled guilty in the months leading up to trial in 2022: Willie Gardley on May 23; Marquel Russell on June 27; Deshawn Morgan on July 5; Victor Turner on July 5; and Nashon Johnson on July 27. All of the plea and cooperation agreements were governed by Federal Rule of Criminal Procedure 11(c)(1)(C). At the plea hearings, the government, counsel for the cooperators, and the cooperators themselves made the following statements under oath about promises made to cooperators regarding their pleas.[1]

***Marquel Russell's*** plea and cooperation agreement called for a sentencing range of 10-20 years, even though Mitchell indicated that a 10-year sentence would be "reasonable." Despite Mitchell's email, Russell stated at his plea hearing that no promises had been made to him beyond what was in the written plea agreement:

> THE COURT: Other than the plea agreement that you originally looked at and this plea addendum, have any other agreements been promised—agreements or promises been made to you that are not in writing?
> MARQUEL RUSSELL: No.
>
> THE COURT: Other than the plea agreement and the addendum, are there any other promises that have been made to you that caused you to plead guilty?
> MARQUEL RUSSELL: No.
>
> THE COURT: Have any promises been made to you about what your sentence will be other than the recommendation it be between 10 and 20 years?
> MARQUEL RUSSELL: No.

---

[1] No party ordered formal transcripts of the plea hearings. The transcriptions here are taken from the rough transcripts provided to the Court by the Court Reporter.

THE COURT: And I'll ask the parties. Other than the plea addendum and plea agreement, are there any other agreements not in writing? First the government.
GOVERNMENT: No, your Honor.
THE COURT: And the defense.
DEFENSE COUNSEL: No, your Honor.

***Deshawn Morgan's*** plea and cooperation agreement called for a sentencing range of 25-35 years, even though Mitchell told Morgan's counsel that Mitchell planned to recommend a 30-year sentence. Despite Mitchell's email, Morgan, Morgan's counsel and the government stated at Morgan's plea hearing that the only promise made to him beyond the written agreements concerned calculation of credit for time served in state custody, with no mention of Mitchell's plan to recommend 30 years:

> DEFENSE COUNSEL: There is a promise outside the plea agreement between the government and our client. The promise is that if you look at the stipulation on page 9, the drug trafficking and stipulation, Mr. Morgan was in custody, Cook County custody from June 2018 until he was transferred into the federal system.
> The agreement between the government and Mr. Morgan is that and we've looked into it, and we can't be sure that the Bureau of Prisons is going to give him credit, so the agreement is that if the Bureau of Prisons doesn't give him credit for the time that he was in the Cook County Jail for Stipulated Offense 1, that the government agrees to come back before Your Honor and ask for the deduction or the credit to be given by you.

> THE COURT: Okay. Well, whatever your agreement is is fine, it's not binding on me whatever your agreement is, I'll accept that. Is that—is that agreement correct per the government.
> GOVERNMENT: It is, Your Honor.

> THE COURT: And other than the original plea agreement, which we talked about a few moments ago and this plea

addendum, and the oral agreement that the government
and your attorneys just noted on the record previously, are
there any other promises or agreements that are not made
in writing? I'll ask first, the government?
GOVERNMENT: No, Your Honor.
THE COURT: And defense?
DEFENSE COUNSEL: No.

THE COURT: All right. Anything else on any aspect of this
plea agreement that needs to be put on the record? First,
the government.
GOVERNMENT: No, Your Honor.
THE COURT: And defense?
DEFENSE COUNSEL: No.

THE COURT: Have any promises been made to you about
what your sentence will be, other than if I accept the plea
agreement it will be between 25 and 35 years in jail?
DESHAWN MORGAN: Yes.

THE COURT: And you agree that's the only promise that's
been made to you about what your sentence will be.
Correct?
DESHAWN MORGAN: Yes.

*Willie Gardley*'s plea and cooperation agreement called for a 20-30 year
sentence. Prior to Gardley's plea hearing, Mitchell told Gardley's counsel that
pleading and cooperating would resolve all of Gardely's "outstanding cases" in state
court. Regarding his sentence, Gardley stated the following at his plea hearing:

THE COURT: Have any promises been made to you about
what your sentence will be.
WILLIE GARDLEY: No.

The Court mistakenly neglected to ask Gardley, his counsel, or the government
specifically about promises beyond his sentence range.

*Victor Turner's* plea and cooperation agreement called for a sentencing range
of 20-30 years. But as mentioned, prior to the plea hearing, Mitchell had told Turner's

counsel that he would "recommend [to the State's Attorney's Office] that they dismiss [Turner's] state murder case right after the change of plea hearing." Despite Mitchell's email, Turner stated at his plea hearing that no promises had been made to him beyond what was in the written plea agreement:

> THE COURT: I'm going to ask the government and defense counsel, have there been any other agreements or promises that are not contained in writing in either the plea agreement or the plea addendum?
> GOVERNMENT: No, Your Honor.
> DEFENSE COUNSEL: No, Your Honor.
>
> THE COURT: Have any promises been made to you about what your sentence will be, other than it'll be between 20 and is 30 years if I accept this plea agreement?
> VICTOR TURNER: No, sir.

***Nashon Johnson's*** plea and cooperation agreement called for a sentencing range of 10-20 years, even though Mitchell told Morgan's counsel that "I fully anticipate recommending a 10-year sentence." Despite Mitchell's email, Johnson stated at his plea hearing that no promises had been made to him beyond what was in the written plea agreement:

> THE COURT: Other than the plea agreement which we spoke about in the earlier part of these proceedings and this plea addendum, have any promises been made to you to cause you to plead guilty?
> NASHON JOHNSON: No.
>
> THE COURT: And have any promises been made to you of what your sentence will be other than what's contained in this plea agreement and plea addendum?
> NASHON JOHNSON: No.

9

### III.   Testimony at Trial

Additionally, the cooperating witnesses testified at trial regarding their cooperation agreements with the government:

***Deshawn Morgan*** (R. 1002 at 1553, 1563):

> GOVERNMENT: As part of your plea addendum in this case, in exchange for your cooperation, you hope to receive a sentence of between 25 and 35 years, is that right?
> DESHAWN MORGAN: Yes.
>
> GOVERNMENT: If you follow through on your end of the bargain, which is to tell the truth, the Government has committed to making a recommendation to Judge Durkin, is that right?
> DESHAWN MORGAN: Yes.
>
> GOVERNMENT: And the recommendation that the Government has committed to making to Judge Durkin in the event that you testify truthfully is a sentence of 25 to 35 years, is that right?
> DESHAWN MORGAN: Yes.

***Nashon Johnson*** (R. 999 at 664-65):

> GOVERNMENT: In exchange for your continued cooperation, what do you expect that the government will recommend in terms of your sentence?
> NASHON JOHNSON: Ten or 20 years.

***Marquel Russell*** (R. 997 at 200):

> GOVERNMENT: And in exchange for your cooperation, do you expect that the government will recommend a sentence between 10 and 20 years?
> MARQUEL RUSSELL: Yes.

***Victor Turner*** (R. 1008 at 3105, 3245-46, 3192-93):

> DEFENSE COUNSEL: Okay. Now, Mr. Turner, I want to move to your plea agreement with the government. When the government first approached you about cooperating in

10

this case, you had already been charged in state court with murder. Right?
VICTOR TURNER: Yes.

DEFENSE COUNSEL: And how many years were you facing in that case?
VICTOR TURNER: 45 to life.

DEFENSE COUNSEL: 45 to life. Okay. And I think you testified that currently you're facing 20 to 30 years if you cooperate. Right?
VICTOR TURNER: Yes.

DEFENSE COUNSEL: Okay. So that murder case has been or will be dismissed against you in state court. Right?
VICTOR TURNER. I don't know.

*       *       *       *

DEFENSE COUNSEL: Your deal with the prosecutors is 20 to 30 years?
VICTOR TURNER: Correct.

DEFENSE COUNSEL: And that's down 15 years from the term you were facing in state court, right?
VICTOR TURNER: Correct.

DEFENSE COUNSEL: You were facing 45 to life, 45 on the bottom, in state court, right?
VICTOR TURNER: Correct.

DEFENSE COUNSEL: And now, here, you're facing 30 on the top, right?
VICTOR TURNER: Correct.

*       *       *       *

DEFENSE COUNSEL: You testified in the grand jury in order to obtain a favorable resolution, right?
VICTOR TURNER: Correct.

DEFENSE COUNSEL: Not only of your state case, correct?
VICTOR TURNER: Correct.

DEFENSE COUNSEL: But also the potential federal case that you would face?
VICTOR TURNER: Correct.

DEFENSE COUNSEL: You knew that there were federal charges coming your way?
VICTOR TURNER: Yes.

DEFENSE COUNSEL: And you wanted to be charged with the least significant charge that you could be charged with, right?
VICTOR TURNER: Correct.

DEFENSE COUNSEL: And you wanted the best possible result you could get?
VICTOR TURNER: Yes.

DEFENSE COUNSEL: And eventually, after you testified in the grand jury, you were able to work out an agreement with the government?
VICTOR TURNER: Correct.

**Willie Gardley** (R. 1024 at 4638-39):

GOVERNMENT: Were you arrested in March of 2021?
WILLIE GARDLEY: Yes.

GOVERNMENT: And what was the charge?
WILLIE GARDLEY: Three attempt murders.

GOVERNMENT: Did you say three attempt murders?
WILLIE GARDLEY: Yes.

GOVERNMENT: And is that a state charge or a federal charge? Were you charged by the state or by the federal government?
WILLIE GARDLEY: State.

GOVERNMENT: This attempt murder charge, was someone injured in the event that forms the basis of that charge?
WILLIE GARDLEY: Yes.

GOVERNMENT: Who was injured?

12

WILLIE GARDLEY: Me.

GOVERNMENT: Okay. Now, is it your understanding that the federal government has communicated to that prosecutor and informed them of your cooperation in this case?
WILLIE GARDLEY: Yes.

GOVERNMENT: But you also understand that the federal government doesn't control what happens to your charge in Cook County; is that correct?
WILLIE GARDLEY: Yes.

## Analysis

Defendants argue that Mitchell's emails show that the government promised the five cooperating witnesses that the government would either make specific sentencing recommendations or advocate to the Cook County State's Attorney's Office that their state charges be dropped. Defendants argue further that the cooperating witnesses' failure to reveal these promises when questioned about their cooperation agreements during their trial testimony constitutes false testimony that the government had an obligation to correct under *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("knowing[ ] use [of] false evidence, including false testimony, to obtain a tainted conviction, . . . . [including when the] false testimony goes only to the credibility of the witness" violates Due Process). According to Defendants, this false testimony "may have had an effect on the outcome of the trial," *Glossip v. Oklahoma*, 145 S. Ct. 612, 626 (2025), such that a new trial is necessary.

## I.  Promises

The government's primary argument is that it did not promise anything to the cooperating defendants that was not contained in their written plea and cooperation

13

agreements. According to the government, none of the statements Mitchell made in the emails he sent to the cooperators' counsel in negotiating their cooperation agreements were "unqualified promises" that any cooperator could have enforced. *See* R. 1171 at 6. But the standard for disclosure is not an enforceable promise. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). Rather, the standard for disclosure under *Giglio* is whether the government had "an agreement or an understanding" to provide a "benefit" to the cooperating witness to "induce" the witness's plea and cooperation. *See Collier v. Davis*, 301 F.3d 843, 846, 848 (7th Cir. 2002); *United States v. Weidenburner*, 550 F. App'x 298, 304 (7th Cir. 2013) ("*Giglio* requires disclosure of inducements for a witnesses' testimony."). "Certainly *Giglio* does not require that the word 'promise' is a word of art that must be specifically employed." *Brown v. Wainwright*, 785 F.2d 1457, 1464-65 (11th Cir. 1986).

The government interviewed Mitchell as part of its investigation prior to making a disclosure to Defendants as ordered by the Court. In that interview, Mitchell stated that his emails to counsel for the cooperating witnesses were intended "to convey his then thoughts about what sentence he would recommend to his supervisors." *See* R. 1148, Ex. R. Although the government never affirmatively characterizes Mitchell's statements in its brief, during a hearing on June 17, 2024, it adopted Mitchell's characterization of his statements as the government's "sort of estimate or prediction of what a recommendation might be."[2] In any case, the

---

[2] No formal transcript of the June 17 hearing was ordered, so this quotation is taken from the rough transcript provided to the Court by the Court Reporter.

government is clear in its insistence that Mitchell's statements were *not* promises. *See* R. 1171 at 8 ("The content of Mitchell's communications demonstrates no promises were made."). The emails, however, speak for themselves.[3]

Mitchell wrote to Morgan's counsel that he and his colleague were "in agreement that if the sentencing were tomorrow, we would recommend a sentence of 30 years . . . Not 31, or 32, but 30. . . . [A]nd if there aren't any problems, I can safely say that our recommendation won't exceed 30 years." R. 1095-10 at 2. On its face, this language constitutes a promise to recommend a 30 year sentence, assuming Morgan didn't do anything in the meantime to make that recommendation inappropriate. The government argues that the qualified nature of Mitchell's statement means that it isn't a promise. But the written plea agreements themselves are also qualified in a similar manner, based on the cooperator providing truthful testimony and not otherwise violating the terms of the agreement. Indeed, it is a fact of life that almost *all* promises are qualified with respect to the circumstances in which they are made. The qualifications in Mitchell's statement do not change the unavoidable and commonsense fact that he knew that by making these statements he was providing a benefit to Morgan in order to induce him to agree to cooperate. As Mitchell stated, "I hope that my commitment in writing that our recommendation is 30 years addresses some of your concerns." *Id.* A promise is a promise, whether qualified or not, and

---

[3] The Court does not question the sincerity or credibility of Mitchell's and the government's characterization of the emails as something other than promises. The Court, however, has reached a different conclusion.

Mitchell's "commitment" to Morgan was a promise that should have been disclosed pursuant to *Giglio*.

Mitchell's sentencing promise to Johnson was just as explicit, although more concise. Mitchell told Johnson, through his counsel, that "while I can't commit to a sentence until closer to sentencing, I fully anticipate recommending a 10-year sentence." *Id.* at 1. Again, this is a promise to provide a benefit that is outside the terms of the written plea and cooperation agreements which called for a sentencing range of 10-20 years. As such, it should have been disclosed.

Mitchell's promise to Russell, through his counsel, was not as explicit, but nevertheless showed an intent to induce Russell to plead guilty. Mitchell stated, the "range is reasonable because [the low end] 10-year sentence would be about 60% below the low end of the guidelines range." *Id.* at 2. There was no reason to make this statement other than to convey that Mitchell would recommend the low-end of the range, which was a ten year sentence. This statement conveyed an "understanding" regarding Mitchell's intention to convey a benefit to Russell in an effort to induce him to plead guilty and cooperate. As such, Mitchell's statement should have been disclosed.

There is no evidence that Mitchell promised specific sentencing recommendations to Turner or Gardley. Instead, Mitchell promised to advocate that their state charges be dropped. Mitchell told Turner, through his counsel, that he would "work with the [Cook County State's Attorney's Office] and recommend that they dismiss the state murder case right after the change of plea hearing." *Id.* at 2.

Whether or not Mitchell could guarantee that the murder charge be dismissed is irrelevant. Mitchell promised to advocate on Turner's behalf, and that advocacy is a valuable benefit to Turner that was intended to induce him to plead and cooperate.

Similarly, Mitchell told Gardley, through his counsel, that "all of [Gardley's] outstanding cases—specifically . . . a pending attempted murder case in Cook County . . . will be dropped before the change of plea hearing." *Id.* at 3. The sincerity of this promised advocacy is further established by later emails showing Mitchell following up with Assistant State's Attorneys to advocate that Gardley get the best deal possible on his state charges. *See* R. 1148 Ex. O. While those later emails occurred after Gardley had testified at trial, they are evidence of the kind of support that Gardley was hoping to receive when he agreed to plead and cooperate. The later emails are corroborative of the finding that the email Mitchell sent prior to Gardley's plea and trial testimony should have been disclosed pursuant to *Giglio*.

This review of Mitchell's emails demonstrates that he was making the statements with the intent to induce the cooperators to cooperate and plead guilty. Mitchell's statements indicate that he believed that what he suggested or offered in his emails were benefits that the cooperators desired. That is the only reason Mitchell would make such statements. They were not idle musings. And for that reason, the emails should have been disclosed pursuant to *Giglio*.

The government makes several arguments that Mitchell's statements were not promises that required disclosure under *Giglio*. The government argues that the emails did not require disclosure because "Mitchell communicated with counsel for

17

the cooperators, not the cooperators themselves." R. 1171 at 8. The government never explains why this is relevant. The Court presumes that Mitchell believed that counsel would communicate his statements to the cooperators, because they have an ethical obligation to do so. And there is no other reason to make the statements to counsel. Counsel for the cooperators were not considering pleading guilty; their clients were, and so the messages were for the cooperators, not counsel. As discussed, the plain language of Mitchell's emails demonstrates an intent to induce guilty pleas and cooperation. The fact that the messages were conveyed through counsel, rather than directly to the cooperating witnesses, is irrelevant.

The government also argues that "Mitchell, and every single defense attorney with whom he corresponded, have confirmed that they did not intend or understand the messages to convey any promises." R. 1171 at 8. But the government cites no authority that such a subjective standard is appropriate. The relevant question is whether, from an objective perspective, Mitchell's statements convey an understanding that a benefit would be provided to the cooperators, such that counsel for Defendants would have found the information to be material to impeachment. And the Court has found that Mitchell's statement satisfy this standard.

Moreover, the government's argument that counsel for the cooperators did not consider Mitchell's statements to be promises is born of a meeting the government had with Morgan's counsel in response to Morgan's counsel relying on Mitchell's email to advocate for the 30-year sentence Mitchell had promised. *See* R. 1147-2 at 1. This meeting occurred prior to Morgan's sentencing and *before* the Court ever raised

18

the issue of a potential *Giglio* violation. *See id.* at 2. The fact that this meeting occurred and its timing belie the government's argument that there was never any concern among the government and Morgan's counsel that Mitchell's email should be considered a promise.[4] The fact that the government appears to have temporarily convinced Morgan's counsel of the government's position that Mitchell's email was not "a promise" is irrelevant to the Court's analysis of this motion. This is especially true considering that when the Court asked Morgan's counsel whether they would have wanted to use Mitchell's email as impeachment if they were in the position of cross-examining Morgan, they conceded that they would. *See* R. 1115 at 20 ("[W]e have put ourselves in the position of an attorney who was cross-examining Mr. Morgan, certainly, I would have liked to have had that email."). The materiality for cross-examination is the relevant standard under *Giglio*, not whether Mitchell's statements were legally binding promises, and not whether Morgan's counsel thought they were.

The government also argues that whether or not Mitchell's statements were promises at the time they were made, the "plea agreements and plea addenda all contain integration clauses indicating that they represent the entire agreement between the parties." R. 1171 at 13. But that is exactly the problem here—the formal plea agreements do not reveal all the benefits provided to the cooperators. Mitchell

---

[4] Notably, despite the fact that the government discussed with Morgan's counsel whether Mitchell's statement constituted a promise, and that this conversation occurred in the aftermath of an undisclosed promise in the *Spann* case, the government did not bring this issue to the Court's attention. Regrettably, the government left it to the Court to connect the dots.

made the statements to *induce* the cooperators to sign the formal plea and cooperation agreements *even though* those agreements did not provide for the specific sentences Mitchell indicated he would advocate for. And with regard to the specific sentencing recommendations, Mitchell could only make those promises outside the formal agreements because he had apparently not been given permission by the U.S. Attorney to include those recommendations in the formal agreements. In other words, the omission of Mitchell's statements from the formal plea and cooperation agreements is the whole point. We wouldn't be here if Mitchell's statements were incorporated in the formal agreements, because the formal agreements were disclosed to Defendants' counsel.[5]

With regard to Mitchell's emails about state charges against the cooperators, the government points out that it "in fact had no power to bind the state as to their decisions regarding whether to bring or whether to dismiss state charges." R. 1171 at 15. Again, this argument misses the point. Of course, the federal government doesn't have the power to compel the State's Attorney to drop state charges. But the government does have the ability to request assistance from state prosecutors and advocate that charges be handled in a way that is advantageous to potential cooperators. That is what Mitchell did here—he promised to advocate with the Cook County State's Attorney's Office on behalf of two of the cooperating witnesses in order to induce them to plead guilty and cooperate. Whether Mitchell's communications

---

[5] The government's reliance on the integration clauses is undermined by its concession that a new trial was necessary in the *Spann* case, because the plea agreement for the cooperating witness in *Spann* also contained an integration clause.

actually affected the outcome of the cooperators' state charges is beside the point. The fact is that Mitchell's communications with Assistant State's Attorneys were a benefit the cooperators desired in order to agree to plead and cooperate.

Notably, the government concedes that "some of the language used by Mitchell . . . could create the mistaken impression that assurances were made." R. 1171 at 13. The government apparently believes it can make this concession because it believes that only "unqualified promises" and "legally binding agreements" are required to be disclosed under *Giglio*. That is simply incorrect. Statements that create the "impression of assurances," as the government describes Mitchell's statements, which were intended to induce cooperation and a plea, must be disclosed under *Giglio*.

## II.    False Testimony

While not the focus of the government's brief, the government clarified at oral argument that its primary position on the motion is that if Mitchell's statements were *not* promises that required disclosure under *Giglio*, then the cooperators' failure to mention those promises when they testified about their cooperation agreements during the trial *cannot be false* testimony. *See* R. 1200. With that focus, the government's brief addresses whether only two of the cooperators testified falsely: Turner and Gardley.

Defendants have the burden to demonstrate false testimony. *See Glossip*, 145 S. Ct. at 626 ("[A] defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it "to go uncorrected when it appear[ed]."). The government argues that Defendants cannot show that either Turner or Gardley

21

testified falsely because neither of them made a factually incorrect statement on the stand. But for purposes of *Napue*, false testimony includes not only testimony "where it can be conclusively established that the government witness was lying," but also "'half-truths' and vague statements that could be true in a limited, literal sense but give a false impression to the jury." *United States v. Freeman*, 650 F.3d 673, 679-80 (7th Cir. 2011). That is what occurred here.

Gardley and Turner testified about their state charges while concealing the information that Mitchell had promised to advocate on behalf of each of them that their state charges be dropped. The government elicited testimony from Gardley that the government had "communicated" with the State prosecutor and "informed them of [Gardley's] cooperation." But the government immediately followed that by eliciting Gardley's testimony that the "federal government doesn't control what happens to [Gardley's] charge in Cook County." Both statements are half-truths in light of Mitchell's advocacy with State prosecutors that Gardley's charges be dropped. Gardley was not merely *hoping* that State prosecutors would look favorably upon his cooperation in the federal case. He *knew* that Mitchell, the lead prosecutor conducting the case in front of the jury Gardley was testifying to, had promised to advocate on his behalf that his state charges be dropped. This was a benefit being provided directly by Mitchell to Gardley that the government failed to ensure was revealed to Defendants' counsel or the jury. Moreover, when the government objected to Defendants' counsel's further questioning about Gardley's state charges, the government represented to the Court at a sidebar that the government had "not

22

instructed the state's attorneys to [dismiss the charges against Gardley]. . . . But in speaking with the State's Attorney's Office, our understanding is that they may end up dropping the charge." R. 1013 at 4905. This representation by the government to the Court had the effect of further concealing the beneficial advocacy Mitchell was providing to Gardley. This makes Gardley's trial testimony about his cooperation agreement false.

Unlike Gardley, Turner's testimony about his state charges was elicited on cross-examination. In response to Defendants' counsel's question confirming that Turner's state murder charge had been dropped, Turner responded "I don't know." He went on to confirm that he had testified in the grand jury, prior to signing a cooperation agreement, with the hope that both his state and federal charges would be reduced, and that he ultimately signed the cooperation agreement for the same reason. The government argues that the fact that Turner testified that his cooperation was motivated by a desire to see his state charges reduced shows that he did not testify falsely about his cooperation agreement. The problem with this argument is that it focuses on what Turner *hoped* would happen when he testified before the grand jury without a formal cooperation agreement. Mitchell's promise came after Turner's grand jury testimony, and Defendants' counsel could not have questioned Turner about that promise because, just like all of the others outlined above, it was not disclosed prior to trial. Unlike the hope that Turner testified about, Mitchell's promise demonstrates that Turner was beholden to Mitchell's personal decision of whether to advocate with the Cook County State's Attorney's Office on

Turner's behalf. True, Defendants' counsel was able to demonstrate in a general sense that Turner's motivation for testifying was self-interested. But without knowledge of Mitchell's email, Defendants' counsel could not reveal that Turner's testimony was specifically biased towards Mitchell's personal evaluation of the merits of his testimony. This additional bias existed outside the formal plea agreement. Turner's testimony about his plea concerned only what was in the formal agreement. The government had an obligation to correct that testimony and reveal that Mitchell's emailed promise was also part of Turner's bias and motivation. Without that correction, Turner's testimony was false.

The false aspects of the trial testimony of Russell, Johnson, and Morgan are not addressed by the government in its brief, likely because it is more straightforwardly false. Russell, Johnson, and Morgan all testified that they were promised the sentencing range in their formal plea and cooperation agreements, but they failed to reveal that Mitchell had promised them specific sentencing recommendations within those ranges. The government had an obligation to correct their testimony and explain that they had been promised more favorable sentencing recommendations than were provided for in the formal agreements. As discussed, the government argues that Mitchell's statements regarding specific sentencing recommendations were not "promises," but mere "thoughts," "estimates," or "predictions," and as such the failure to reveal Mitchell's statements does not make the testimony of Russell, Johnson, and Morgan false. But, for the reasons discussed above, the Court has found that Mitchell's statements were promises that induced

24

Russell, Johnson, and Morgan to plead guilty and cooperate. And as such their testimony that that they had only been promised certain sentencing ranges were "half-truths" that required correction with reference to Mitchell's emails. Whether the particular Assistant United States Attorney questioning the witnesses knew of Mitchell's promises is not relevant. The government as an entity is charged with knowledge of what Mitchell said in his emails. *See United States v. Dimas*, 3 F.3d 1015, 1018 (7th Cir. 1993). The government does not argue otherwise. Therefore, the testimony of Russell, Johnson, and Morgan regarding their cooperation agreements was false.

## III. Fair Trial

Under *Napue*, false testimony must be material to justify a new trial. The standard for materiality under *Napue* is "considerably less demanding" than other materiality standards on constitutional claims arising from criminal cases. *See Clements v. Madden*, 112 F.4th 792, 802 (9th Cir. 2024). For example, under *Giglio* the burden is on *Defendants* to show that the false statements "*would* have changed the result of the trial." *United States v. Morales*, 746 F.3d 310, 315 (7th Cir. 2014) (emphasis added). By contrast, *Napue's* more lenient standard requires only that there be "any reasonable likelihood" that the false testimony "*could* have affected the judgment of the jury." *Glossip*, 145 S. Ct. at 626-27 (emphasis added). And unlike *Giglio*, the burden under *Napue* is on the *government* "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 627 (the burden is on "the beneficiary of [the] constitutional error").

25

Under this standard, the government's statements in support of its sentencing recommendations for the cooperators' serve to establish materiality. With respect to **_Gardley_**, the government stated the following:

> Gardley provided important information about the rules of the gang – including the rules about not selling or losing guns and using violence to retaliate and protect the gang interests. *With respect to these rules, Gardley's testimony was more impactful and illustrative than most other cooperators who testified.* . . . Moreover, Gardley was able to articulate for the jury how each act of violence he committed was done in retaliation or to protect the gang's interest. . . . *Crucially, Gardley's testimony allowed the jury to hold Donald Lee – Gardley's chief who provided a firearm for the Weathers murder – responsible for the murder through a special finding. Despite being cross-examined at length about Lee providing the firearm, the jury credited Gardley's account and found that the government has proven that Lee provided the murder weapon.*

> Gardley's testimony assisted the government in bringing RICO conspiracy charges by helping to establish the enterprise and specific racketeering acts. For example, based in part on Gardley's testimony, the government sought a specific finding against Wicked Town Chief Donald Lee for Lee's role in the murder of Charlie Weathers and Kishaun Mobley as part of Count One of the superseding indictment.

> Additionally, and most importantly, Gardley's testimony was likely *the deciding factor* in the jury finding that the government had proven that Lee aided and abetted the murder of Charlie Weathers and Kishaun Mobley[.]

> In fact, but for Gardley's own admissions, the government would not have known about his or Torance Benson's involvement in the murder of Deante Dale or the attempted murder of Individual JD [Jamel Davis] in January 2016. . . . As noted above, Gardley also provided valuable information about acts of violence committed by other

Wicked Town members including . . . crucially, Torance Benson.

The government also sought special findings against co-defendant Torance Benson based, in large part, on Gardley's testimony. Specifically, the government sought a special finding against Benson for the attempted murder of Individual MS [Montel Spurlock]. And although the government did not seek a special finding for the murder of Deante Dale or the attempted murder of Individual JD [Jamel Davis], Gardley's testimony with respect to those acts of violence helped to establish two key elements at trial: (1) the murder of Dale and attempted murder of Individual JD [Jamel Davis] provided critical context for the government's theory of the case with respect to Benson's murder of fellow Wicked Town Traveler Martel Howard (*i.e.*, Benson falsely claiming that the murder of Dale was to retaliate for Howard's death); and (2) the targeting of suspected MOF members provided another piece of evidence in support of Wicked Town as an enterprise.

Gardley was perhaps the cooperator most critical in helping to hold Benson accountable for his crimes, especially in light of co-defendant Demond Brown not testifying at trial. . . and that [his testimony] was likely the *deciding factor* in the jury finding that the government had proven . . . that Benson pulled the trigger in the attempted murder of Individual MS.

R. 1028 (emphases added).

With respect to **_Morgan_**, the government stated the following:

Morgan's cooperation was incredibly valuable at trial. Several younger Wicked Town members (i.e., Victor Turner, Willie Gardley, Deshon George) testified about their experience in the gang and acts committed by other younger Wicked Town members, including *Torance Benson*. On the other end of the equation, older members (*i.e.*, Marquel Russell, Nashon Johnson) testified about the founding of Wicked Town and about the rise of Donald Lee as they experienced it. *Morgan was one of the few witnesses at trial who walked in both worlds and could make the*

*connection for the jury. Specifically, Morgan was by Lee's side as Lee rose to be the leader of Wicked Town. And as detailed in the plea agreement and in the government's public sentencing memorandum, Morgan was close with several of the younger Wicked Town "shooters," including Darius Murphy, Demond Brown, and Torance Benson. Morgan was able to act as a bridge for the jury to walk from one generation of Wicked Town to the next.*

Morgan provided valuable information about Wicked Town, its structure, its drug activities, its violent acts, its members, and, importantly its leader Donald Lee. Morgan even testified about Lee's ascent to the gang, including Lee's murder of rival Four Corner Hustler John Johnson. . . . Morgan certainly played a part in helping hold Lee accountable for his crimes, including the murder of John Johnson, for which a special finding was made by the jury.

Morgan was the only cooperator who testified at trial about the murder of Donald Holmes, Jr. and Diane Taylor. Morgan explained his understanding at the time that Holmes was cooperating with law enforcement against not just Morgan but also against Marquel Russell. Morgan's testimony was helpful in explaining for the jury why Murphy and Brown were so eager to participate and why the murders were connected to the affairs of Wicked Town.

R. 1097 (emphases added).

With respect to ***Turner***, the government stated the following:

Turner provided the investigators with valuable information about Wicked Town, its structure, its drug activities, its violent acts, its members, and importantly, its leader Donald Lee. *In fact, more than perhaps any other witness in this case, Turner was able to speak, at length, about Wicked Town's drug trafficking enterprise, including where the drugs were sourced (Donald Lee), how the drugs were broken down and packaged, and how and where the drugs were sold (400, 500, 600, and 700 blocks of North*

>*Leamington). This was a significant piece of the puzzle in building a RICO conspiracy case against Wicked Town.*
>
> Turner was perhaps the cooperator most knowledgeable and fluent in the gang's drug trafficking enterprise, and his testimony in that regard was highly probative in establishing that the gang constituted a RICO enterprise. *Additionally, and most importantly, Turner's testimony was likely the deciding factor in the jury finding that the government had proven that Lee directed the murder of Malcolm Willie.*

R. 952 (emphases added).

>With respect to ***Russell***, the government stated the following:

> He provided extensive information about his role in founding Wicked Town, *Donald Lee's rise to power, and Wicked Town's evolution under Lee's leadership into an organization singularly focused on violence. Of note, Russell also detailed his substantial history of drug trafficking,* much of which was otherwise unknown to the government.

R. 934 (emphases added).

>And with respect to ***Johnson***, the government stated the following:

> Johnson provided investigators with valuable information about Wicked Town, its structure, its drug trafficking activities, its violent acts, its members, and importantly its leader, Donald Lee.
>
> Johnson, who was an active Wicked Town member in the early 2000s, was able to speak about, and later testify to, Lee's rise to power. Johnson credibly testified that Lee was able to take over Wicked Town in and around 2004 and 2005 because Lee "had killed the leader of the rival Four Corner Hustlers," "Forehead," which "boosted [Lee's] recognition." Johnson also testified, at length, about Wicked Town's rules—(1) do not sell or lose guns, and Lee controls all guns; (2) use violence to retaliate against rival gang members and suspected cooperators and to protect the gang's interests; and (3) do not talk to law enforcement.

> In addition to RICO enterprise evidence, *Johnson provided highly valuable testimony regarding the December 23, 2002, murder of Ernest Moore and attempted murders of Tamarkin Blumenberg and Henry Stevenson, for which Donald Lee was convicted of a Murder in Aid of Racketeering, or VICAR, count, which carries a mandatory minimum life sentence, and additional findings as part of Count One of the superseding indictment.*
>
> Critically . . . Johnson did not shoot on December 23, 2002. In fact, Johnson lied to Lee and said his gun was jammed. At trial, when asked about his lie, Johnson testified that he "didn't want to kill the people in the car." It is not lost on the government that Johnson's lie was at great personal risk, as Lee demanded that Wicked Town members use violence against threats to Wicked Town. Wicked Town members, including Johnson, knew that defiance of Lee could result in beatings, or worse. Johnson's decision not to shoot uniquely situates him among his fellow cooperators—*high value of testimony that resulted in a VICAR conviction against Donald Lee* and a relatively lower level of violence.

R. 1062 (emphases added).

Having essentially conceded the materiality of the cooperators' testimonies to all aspects of the case against Defendants, it is not possible for the government to show beyond a reasonable doubt that revelation to the jury of the cooperators' false testimony could not have affected the jury's judgment. This is especially true because the analysis "turns on the cumulative effect" of the tainted evidence on the fairness of a trial. *See Kyles v. Whitley*, 514 U.S. 419, 421 (1995). Taken together, and under *Napue's* lenient standard, the government's concessions demonstrate that there is a

*reasonable likelihood* that the false testimony *could* have affected the judgment of the jury, such that a new trial is necessary here.

Although the government does not directly address its burden under *Napue*, the government argues that revelation of the cooperators' false testimony would merely be cumulative impeachment evidence for witnesses who were already impeached with serious criminal activity. This argument "does not adequately engage the inquiry *Napue* requires." *See Clements*, 112 F.4th at 804. As in *Napue*, "the fact that the jury was apprised of other grounds for believing that the witness . . . may have had an interest in testifying against petitioner" does not turn "what was otherwise a tainted trial into a fair one." *Id.* (quoting *Napue*, 360 U.S. at 270). And as the Ninth Circuit explained in *Clements*, "even if" the jury did not convict Defendants "*just* because" of the cooperators' testimony, that is not the standard under *Napue*. *Id.* Rather, it is enough under *Napue* that there is a "reasonable likelihood" that the cooperators' testimony "*could have*" affected the jury's judgment.

The government also argues that there was sufficient evidence other than the cooperators' testimony to convict Defendants. But that is also not the correct analysis. Under *Napue*, the Court does not "set aside the tainted evidence and assesses the sufficiency of what is left." *Clements*, 112 F.4th at 804 (citing *Kyles v. Whitley*, 514 U.S. 419, 435 n.8 (1995)). Rather, the Court analyzes what "potential impact" the knowledge of the false testimony and its circumstances would have on the jury's evaluation of the cooperators' credibility and the case as a whole. *See Clements*, 112 F.4th at 804. As discussed, the false testimony is material if there is *any* reasonable

likelihood that it *could* have affected the jury. That is the case here even if the remaining evidence could have been sufficient for a conviction.

A skeptic of the Court's finding here might argue that the Court has inappropriately presumed that jurors would place any great weight on the knowledge that the government had promised the cooperators specific sentencing recommendations or advocacy about state charges. The skeptic might say the jury almost assuredly assumed such promises had been made in the context of reaching a cooperation agreement. And full revelation of the government's negotiations with the cooperators changes none of the substantive evidence against the Defendants. The government's brief, in sum and substance, makes these kinds of arguments.

From this perspective—i.e., the fact that none of the cooperators are alleged to have testified falsely about the substantive facts of the case against Defendants—the false testimony here is relevant only to the cooperators' credibility. And credibility is generally a question of whether the Defendants had a fair opportunity to impeach the cooperators. The government takes this perspective and argues that the undisclosed promises and the false testimony are merely cumulative impeachment evidence that pales in comparison to the significant impeachment evidence actually utilized and the overwhelming substantive evidence of Defendants' guilt.

But the prohibition on the use of false testimony, and the rationale for *Napue's* more lenient standard, do not "cease to apply merely because the false testimony goes only to the credibility of the witness." *Napue*, 360 U.S. at 269. In arguing that the cooperators' false testimony is not material because it is only relevant to credibility,

the government fails to perceive the insidious nature of its misconduct, which amounts to a "corruption of the truth-seeking function of the trial process." *United States v. Freeman*, 650 F.3d 673, 681 (7th Cir. 2011); *see also Clements*, 112 F.4th at 803 (The Supreme Court "has made clear that claims that the prosecution knowingly used false evidence to obtain a conviction are subject to a more lenient materiality standard not just because [they] involve prosecutorial misconduct, but more importantly because they involve a 'corruption of the truth-seeking function of the trial process.'" (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976))); *see also Agurs*, 427 U.S. at 103 nn.8-9 (collecting cases).

The corruption of the truth-seeking function of the trial is particularly apparent here for three inter-related reasons. First, the concealed nature of Mitchell's promises created the risk that the cooperators would fabricate testimony to ensure that Mitchell followed through on those promises. At least one of the cooperators—Gardley—proffered information about a murder between the time Mitchell promised that he would advocate for Gardley's state charges to be dropped and Gardley's trial testimony. *See* R. 1148 at 38; R. 1177 at 28.[6] There is no indication that Gardley's proffer was false, and the Court cannot say that it was. The problem is that Gardley and the other cooperators had an incentive to please Mitchell outside the terms of the formal cooperation agreement and the Court's supervision of that agreement. With a cooperation agreement signed and testimony given at trial, it is ultimately the Court,

---

[6] The discovery records that would show that Defendants have accurately described the timing of Gardley's proffer are not in the record. But the government does not dispute Defendants' account of the timing. *See* R. 1171 at 36 n. 11.

when it imposes a sentence, that determines whether the cooperating witnesses complied with their obligation to give truthful testimony as required by the cooperation agreement. And in accepting a plea and imposing sentence, the Court relies on the government and defense counsel to fully disclose the circumstances leading to the plea. By contrast, the government, through Mitchell, retained the unilateral right to advocate for state prosecutors to drop charges without the Court's knowledge or supervision. The fact that Mitchell had made promises to the cooperators that were unknown to the Court and the jury meant that Mitchell could revoke those promises without changing the terms of the formal plea and cooperation agreements, which were made public through disclosure to the Court. The fact that Mitchell retained this unilateral power, even if not exercised, created a risk that the cooperators might have been incentivized to prioritize doing everything they could to maintain or curry favor with Mitchell *without regard to the truth*. Some of their testimony was corroborated, but not all of it, and some was only corroborated by other cooperators implicated in this motion. This countervailing incentive was concealed from the jury, counsel for Defendants, and the Court.

Second, the risk that Mitchell's concealed promises created an incentive outside their formal cooperation agreements was exacerbated by the fact that the government emphasized to the jury that the cooperation agreements were an *indication of credibility* because the cooperating witnesses would lose the benefits provided by the agreements if they did not testify truthfully as they had promised. The government elicited testimony from each cooperating witness that they had

promised to testify truthfully in exchange for significant decreases in their sentencing ranges. And then in its closing argument, the government argued that the credibility of the cooperating witnesses was inextricably tied to their cooperation agreements:

> Every single one of those people who got a benefit told you they were getting that benefit. Told you they had an expectation that they'd get something in return. They told you that at the beginning of their direct examinations. They put their cards out on the table for you so you had all the information you needed from the jump to evaluate their credibility. Okay?
>
> Now, the other thing, every single person who told you who received a benefit is the following: There's a huge linchpin to every single one of those benefits. Big linchpin. They have to tell the truth. Lying equals no deal. That's true for all of the cooperators, for everyone who received a benefit in this case. Lying equals no deal.
>
> Now, again, I said—I just said some of these benefits, they're a big deal. We acknowledge that. But because they're a big deal, the truth-telling is a really powerful motivator. They don't want to give up their reduced sentences. They don't want to give up the hope that a state prosecutor is going to do something on their behalf. They don't want to do that. *So they're going to tell the truth because why would they undermine that benefit for themselves.*
>
> So when you think about any benefits that were given to cooperators, it's important that you pair it with that requirement that they tell the truth. They are two sides to the same coin, and they can't be separated.

R. 1019 at 6085-86 (emphasis added). By emphasizing that the jury should believe the cooperating witnesses for the very reason that they cooperated, the government made the plea and cooperation agreements part of the foundation of the jury's basis for conviction.

Furthermore, the government's misleading argument that the plea and cooperation agreements are an indication of credibility is ultimately founded upon the authority of *the Court*. The plea and cooperation agreements are entered into before the Court and accepted by the Court. In accepting the plea agreements, and then imposing sentences, the Court relied on the government to fully disclose the circumstances of the plea and the facts that warrant its acceptance. This is all the more important here where under Federal Rule of Civil Procedure the Court did not accept the plea and cooperation agreements until after the trial at the time of sentencing. Although merely an argument of the government, and not substantive evidence, the government's closing argument that the cooperation agreements are an indication of credibility was a *foundational* reason and justification for the jury to convict the Defendants. And this is so largely because the truth is ultimately backstopped by the Court through its acceptance of the plea and cooperation agreements.

This foundation is completely undermined by the government's failure to disclose Mitchell's promises and failure to ensure that the cooperating witnesses testified correctly about those promises. With Mitchell's promises concealed, the government's argument that the cooperation agreements are an indication of credibility painted an inaccurate picture of the cooperators' incentives. Contrary to the government's argument, the objective truth and the terms of the cooperation agreements were *not* the only standards relevant to assessing the cooperators' credibility. Rather, the cooperators knew that Mitchell had promised them benefits

beyond the terms of the formal cooperation agreements. While the formal agreements promised a certain sentencing range in exchange for true testimony, the requirements for Mitchell to follow through on his promises outside the formal agreements were entirely ambiguous and personal to him. This created a risk that the cooperators were influenced by incentives beyond the formal agreements.

This risk was not revealed at trial, and in fact, the government argued that the formal plea and cooperation agreements were an indication of credibility. This fundamental flaw in the trial's foundation in the truth can only be remedied with a new trial.

*    *    *    *

The Court does not make these findings lightly. A trial of this magnitude costs enormous judicial and public resources, including those of the United Sates Marshals Service, the United States Attorney's Office, the various criminal investigative agencies, and the Criminal Justice Act attorneys appointed for all the defendants in this case (including the cooperators), that would otherwise be spent on other serious cases. Further, the Court has observed at sentencings for the cooperators and other defendants that the evidence at trial showed that Defendants were key parts of one of the most violent street gangs in Chicago. While the Court believes that the government's misconduct here was unintentional, it nevertheless implicated the fundamental fairness of Defendants' trial for the reasons discussed above. And the Due Process rights of criminal defendants must be respected and protected, especially

here where one of the Defendants faces a mandatory sentence of life in prison if convicted of the most serious charges. Therefore, a new trial is necessary.[7]

## IV. Dismissal is not Appropriate

In general, the proper remedy for a Due Process violation at trial is a new trial. *See Giglio*, 405 U.S. at 150-55. Some Circuits, however, have held that it might be possible for the government's conduct to be "so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction." *Conley v. United States*, 5 F.4th 781, 799 (7th Cir. 2021). But the Seventh Circuit has "repeatedly rejected the existence of an outrageous conduct defense." *Id.* And in any event, even assuming the government knowingly permitted the false testimony at issue here, this would still not be a basis to find that the government acted "outrageously."

Defendants make a number of arguments about the government's pre- and post-trial conduct to argue that dismissal is required. *See* R. 1177 at 33-41. The Court has addressed this conduct and explained how it undermined the fairness of the first trial. However, Defendants have not made a showing that the government's conduct was intentional, and even if it was, Defendants have not made a convincing argument that this conduct was "outrageous."

---

[7] Because the Court finds that the false testimony associated with Mitchell's promises is a sufficient basis to grant a new trial, it is unnecessary for the Court to address Defendants' argument that the government's promises to recommend the cooperators be incarcerated in "drop out" facilities was a benefit that required disclosure under *Giglio*.

The two cases relied on by Defendants in which the Ninth Circuit has affirmed indictment dismissals are inapposite. In *United States v. Bundy*, there was a failure to disclose exculpatory evidence, not just impeachment material. *See* 968 F.3d 1019, 1031 (9th Cir. 2020). And in *United States v. Chapman*, after repeatedly attempting to use impeachment evidence that had not been disclosed, the government confessed to the Court that it "had not kept a log of what materials the government had turned over." 524 F.3d 1073, 1079 (9th Cir. 2008). Nothing so outrageous has occurred in this case.

Additionally, any prejudice Defendants will suffer from a second trial is no greater than in any case of a new trial required due to government misconduct. This is similarly true of Defendants' arguments that a new trial is not a sufficient remedy here. In fact, the government is likely prejudiced to a greater degree than Defendants because the cooperators may be less cooperative now that they have been sentenced. Lastly, this opinion and order addressed the need for deterrence, and the government has represented that it is already using this case and the *Spann* case in training its attorneys as examples of what not to do.

As discussed, the false testimony at issue here did not touch upon the substantive facts of Defendants' guilt. And as this Court recently found, false testimony that is relevant to credibility alone is likely an insufficient basis to dismiss an indictment. *See Spann*, 2025 WL 1017668, at *3. The Court makes the same finding here.

**Conclusion**

Therefore, Defendants' motion [1147] [1148] is granted in part and denied in part. The motion for a new trial is granted, and the motion to dismiss the indictment is denied. The trial has been scheduled for September 2, 2025.[8]

The similarity of the circumstances in this case to those in the *Spann* case make the Court's conclusion in that case equally appropriate here: "A new trial is a necessary remedy for and consequence of the government's unforced error. Saying that the error was avoidable is an understatement. It should not have happened. Whatever the characterization, the result is a disservice to the victims and their families who will be forced to endure another trial." 2025 WL 1017668, at *3.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: June 26, 2025

---

[8] Defendant Benson does not seek a new trial on his conviction on Count Five for being a felon in possession, *see* R. 1148 at 47, so no new trial is granted on that Count.